United States District Court
Southern District of Texas

**ENTERED**

August 16, 2019

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LEONARD CHARLES HICKS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-18-2952 |
| | § | |
| LORIE DAVIS, DIRECTOR, TEXAS | § | |
| DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, CORRECTIONAL | § | |
| INSTITUTIONS  DIVISION, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND RECOMMENDATION GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge in this proceeding brought pursuant to 28 U.S.C. § 2254 is Respondent's Motion for Summary Judgment (Document No. 10) against Petitioner's Federal Application for Writ of Habeas Corpus (Document No. 1). Having considered Respondent's Motion for Summary Judgment, Petitioner's response, filed as a "Motion to Strike Summary Judgment as Fraud, Hearsay" (Document No. 19), the claims raised by Petitioner in his § 2254 Application, the state court records, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Respondent's Motion for Summary Judgment (Document No. 10) be GRANTED, that Petitioner's Federal Application for Writ of Habeas Corpus (Document No. 1) be DENIED, and that this case be DISMISSED WITH PREJUDICE.

I.      **Introduction and Procedural History**

Leonard Charles Hicks ("Hicks") is currently incarcerated in Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID), as a result of a 2014 felony conviction for aggravated sexual assault of a child in the 262nd District Court of Harris County, Texas, cause no. 1373854, for which he was sentenced to sixty-five (65) years imprisonment.  Hicks was charged by indictment with that offense on May 1, 2013, with the indictment also alleging two prior felony convictions for sentence enhancement purposes.   Hicks pled not guilty and proceeded to trial.  On March 5, 2014, a jury found Hicks guilty, and following a punishment hearing, sentenced Hicks to sixty-five years imprisonment.

Hicks appealed his conviction to Texas' Fourteenth Court of Appeals, which affirmed the conviction in an unpublished opinion on June 30, 2015.  *Hicks v. State*, No. 14-14-00263-CR (Tex. App.–Houston [14th Dist.] June 30, 2015).  Hicks' petition for discretionary review was thereafter denied on November 4, 2015.  On January 27, 2017, Hicks filed a state application for writ of habeas corpus.  That application was denied by the Texas Court of Criminal Appeals without written order on August 22, 2018, on the findings of the trial court without a hearing.  This § 2254 proceeding, which was filed by Hicks on or about August 27, 2018, followed.

II.     **Factual and Evidentiary Background**

The factual and evidentiary background, summarized by the Texas Court of Appeals in its published opinion affirming Hicks' conviction, is as follows:

> The female complainant, who was five-years-old at the time of trial, is appellant's daughter. In January 2012, when complainant was three-years-old, she began living with two adults, Janet Green and Pamela Richardson. These women did not know complainant or her family but learned of her situation from a mutual acquaintance.

2

They agreed to temporarily care for complainant because she and her siblings were being removed from their parents' home and all the siblings had been placed elsewhere. Complainant's placement in the home was subsequently extended through actions of relevant agencies. In the fall of 2012, her younger sister was also placed there. At the time of trial (over two years after complainant first arrived), both children were still living in the home.

According to the women's collective testimony, when complainant arrived, she was very intelligent and talkative but displayed inappropriate behavior and made statements that caused them concern. For instance, complainant would put on "a little tutu skirt" and high-heel shoes and dance like "somebody in a strip club." She "play[ed] with herself" a lot in a manner that was more than just a curious three-year-old touching her genitals. She "masturbat[ed]" using toys that were hard objects and placed stuffed toys between her legs. Once, while bathing, she aggressively moved a tubular-shaped toy back and forth between her legs, toward her genitals. When asked how she learned that behavior, she replied, "my daddy." Additionally, she was afraid of men, the police, going to jail, and being shot with a gun. She "always" talked about the "terrible things" that happened at home and said she would rather kill herself than be killed by her parents.

Richardson, who was designated as the outcry witness, more specifically testified that complainant said (1) her father would "stick" his finger in her "to-to," the term she used to described her vaginal area, which caused bleeding because his fingernails were long, (2) her father would snatch her off the toilet while he was naked, put her on his lap, and "go up and down" with her, and (3) when her parents found complainant while playing hide-and-seek, they would "play in my to-to" and make her brother (who was two years older) "dig" in her "to-to."

Shortly after complainant's arrival in the home, Green contacted Children's Protective Services ("CPS"), which referred the child to the Children's Assessment Center ("the Center"). A forensic interviewer at the Center interviewed complainant in March 2012, but she did not reveal any abuse, and no charges resulted, at that time.

Meanwhile, Green also took complainant to a pediatrician. That doctor did not testify at trial, but her records were admitted. According to those records, Green reported complainant was afraid of men, she was caught enacting a sexual act with a doll, she disclosed that her mother made complainant's brother "play with her 'tutie' (her word for vagina)," and the child repeated the same information to the doctor. The pediatrician recommended that complainant continue with the CPS assessment, which was ongoing at that time.

After the CPS investigation was closed, complainant's behavior continued at home, and the women placed her in therapy. The therapist testified that, at the outset of their sessions, complainant would cower near men and was depressed and anxious. The

3

therapist did not relay any express statements made by complainant but testified that complainant eventually spoke about "the things that occurred" with her parents and consistently gave the same version. A psychiatrist treated complainant along with the therapist. Complainant was diagnosed with various unrelated conditions, such as Attention Deficit Hyperactivity Disorder, but also Post Traumatic Stress Disorder, which the therapist explained was based on complainant's life with her parents.

In September 2012, complainant's teacher contacted Green because of an incident at school. When another child wanted to undress some dolls, complainant "threw a fit" and insisted, "don't do that because she's going to get hurt like I did by my daddy." The teacher tried to calm complainant, but she repeated the doll would get hurt "like my dad hurt me" if her clothes were removed. This report prompted Green to again contact CPS, and the child was referred to the Center.

Complainant then met with the same forensic interviewer, who testified that this time the child made "disclosures." The interviewer was precluded at trial from revealing those statements but testified the child placed her finger in the vagina of an anatomically correct doll and twisted the finger. The interviewer also explained that often a child will not open up during a first interview but does later after feeling more comfortable due to family support or having attended therapy.

Complainant was also examined by a physician at the Center. The physician's testimony, and portions of her medical records, reflected the following exchange: Complainant told the physician, "my daddy touched my ear and in my back, my behind." The physician asked, "what did he do to your behind?" Complainant responded, "he rubbed my front. He rubbed with my front. When he was trying to play with my front with his finger, I keep watching cartoons and he kept—and I kept hitting him away."

Additionally, those medical records reflected the following history, as provided by the referring adults: (1) complainant exhibited "sexualized behaviors"; (2) she had disclosed that appellant "put his fingers in [her] vagina"; and (3) "there had been allegations against dad since [the caregiver] first received child." The records include a comment from the physician that complainant "gives clear [history of] fondling of genitals by father."

This second assessment resulted in a CPS disposition of "reason to believe." The police arrested appellant for aggravated sexual assault of a child.

Complainant testified at trial that appellant twice "digged in my to-to." Further, her brother testified that shortly before the family separated, he saw appellant touch complainant's "middle part," the term the brother used to describe complainant's genitals, and appellant made the brother hit complainant in her "private area."

4

*Hicks v. State*, No. 14-14-00263-CR, 2015 WL 3994968, at *1–2 (Tex. App. June 30, 2015)

**III.    Claims**

Hicks raises five claims in his § 2254 application:

1.    that his due process rights were violated by the prosecutor's misconduct, including her emotional appeal to the jury;

2.    that he is actually innocent given the contents of a recent affidavit in which a witness recanted his trial testimony;

3.    that his appellate counsel was ineffective for failing to appeal the trial court's denial of his motion for a mistrial;

4.    that the trial court erred and violated his due process rights when it: (a) failed to rule on his motion for new trial; (b) failed to address and rule on his motion for recusal in the state habeas proceeding; and (c) engaged in ex parte communications with Anna Emmons, an attorney ad litem appointed to represent D'Antye Johnson, in the state habeas proceeding; and

5.    that his trial counsel was ineffective for: (a) failing to interview witnesses prior to trial, including D'Antye Johnson and Kristian Johnson; (b) failing to request a limiting instruction following the trial court's denial of his motion for a mistrial; (c) failing to call expert witnesses; and (d) failing to emphasize that Hicks has been "ruled out" as a suspect/perpetrator by Child Protective Services (CPS).

Respondent argues in the Motion for Summary Judgment that Hicks' claims were all considered and rejected by the Texas Court of Criminal Appeals in connection with the denial of his state application for writ of habeas corpus, and that that adjudication of his claims was not contrary to or based on an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Respondent, consequently, maintains that summary judgment is warranted on all of Hicks' claims under 28 U.S.C. § 2254(d).

## IV.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a claim presented in a federal habeas corpus proceeding has already been adjudicated on the merits in a state proceeding, federal review is limited.  28 U.S.C. § 2254(d) provides:

(d)  An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the Supreme] Court 'refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision.'"  *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

"[A] decision by a state court is 'contrary to' [the United States Supreme Court's] clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent.'"  *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams*, 529 U.S. at 405-406).  A state court decision involves an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  "State-court decisions are

measured against [the Supreme Court's] precedents as of 'the time the state court renders its decision.'" *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)).  Similarly, state court decisions are reviewed under § 2254(d) by reference to the facts that were before the state court at the time.  *Id.* ("It would be strange to ask federal courts to analyze whether a state court adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.").

For factual issues, "the AEDPA precludes federal habeas relief unless the state court's decision on the merits was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" 28 U.S.C. § 2254(d)(2) (2000). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, factual determinations made by state courts carry a presumption of correctness and federal courts on habeas review are bound by them unless there is clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1) (2000). *Smith v. Cockrell*, 311 F.3d 661, 667 (5th Cir. 2002), *cert. dism'd,* 541 U.S. 913 (2004).

Under § 2254(d), once a federal constitutional claim has been adjudicated by a state court, a federal court cannot conduct an independent review of that claim in a federal habeas corpus proceeding. *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  Rather, it is for the federal court only to determine whether the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, and whether the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Woodford*, 537 U.S. at 27 ("The

federal habeas scheme leaves primary responsibility with the state courts for these judgments and authorizes federal-court intervention only when a state-court decision is objectively unreasonable."). This is true regardless of whether the state court rejected the claims summarily, or with a reasoned analysis. *Cullen*, 563 U.S. at 187 ("Section 2254(d) applies even where there has been a summary denial."). Where a claim has been adjudicated on the merits by the state courts, relief is available under § 2254(d) *only* in those situations "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Richter*, 562 U.S. at 102.

Whether a federal habeas court would have, or could have, reached a conclusion contrary to that reached by the state court on an issue is not determinative under § 2254(d). *Id.* ("even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable."). In addition, the correctness of the state court's decision is not determinative. As instructed by the Supreme Court in *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), "[i]n order for a federal court to find a state court's application of our precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. . . . The state court's application must have been 'objectively unreasonable.'" (citations omitted); *see also Price*, 538 U.S. at 641 ("'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.'") (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)). Moreover, it is the state court's ultimate decision that is to be reviewed for reasonableness, not its reasoning. *Neal v. Puckett*, 286 F.3d 230, 244-46 (5th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003); *Pondexter v. Dretke*, 346

F.3d 142, 148-9 (5th Cir. 2003), *cert. denied*, 541 U.S. 1045 (2004).  A habeas petitioner can only overcome § 2254(d)'s bar "by showing that 'there was no reasonable basis'" for the state court's rejection of his claim(s).  *Cullen*, 563 U.S. at 188 (quoting *Richter*, 562 U.S. at 98)).

## V.      Discussion – Prosecutorial Misconduct Claim (Claim 1)

In his first claim, Hicks complains about the prosecutor's conduct during her direct examination of D'Antye Johnson, the complainant's sister.  According to Hicks, the prosecutor, while eliciting testimony from D'Antye about his knowledge of his father's abuse of the complainant, was crying and emotional, and that her conduct, whether intended or not, affected his right to a fair trial.

A claim of prosecutorial misconduct that is based on improper argument, statements or questioning of witnesses will generally not provide "a ground for relief unless it casts serious doubt upon the correctness of the jury's verdict." *Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).  "Only where improper prosecutorial comments substantially affect the defendant's right to a fair trial do they require reversal." *Id.*; *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("the relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process"). Three factors are considered in determining whether prosecutorial misconduct rises to the level of a due process violation: "1) the magnitude of the prejudicial effect of the remarks; 2) the efficacy of any cautionary instruction given by the judge; and 3) the strength of the evidence supporting the conviction." *Id.*  Where the improper prosecutorial statement, argument, or line of questioning is not so pronounced and persistent when viewed in the context of the entire trial, no relief is available

9

on such a claim of prosecutorial misconduct. *Bradford v. Whitley*, 953 F.2d 1008, 1013 (5th Cir.), *cert. denied*, 506 U.S. 829 (1992).

Here, the state courts determined in the state habeas proceeding, by reference to state law, that the prosecutor had not engaged in misconduct. Notwithstanding the reference to and reliance on state law for rejecting this prosecutorial misconduct claim, the state courts' rejection of Hicks' prosecutorial misconduct claim is not contrary to or based on an unreasonable application of clearly established federal law and is also not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The record reflects that the prosecutor, Erin Epley, when questioning the complainant's brother, D'Antye Johnson, became emotional. Defendant's counsel (Kenneth McCoy) asked for a break, after which the following took place on the record:

> Defense counsel: Judge, I need to put something on the record.
>
> Judge, I need the record to reflect that during the direct examination of the witness, the Prosecutor started tearing up, broke down in front of the jury, started becoming very emotional. That's why I asked for the jury to be excused for the Prosecutor to have a moment to herself. I would also note that the record – have the record reflect that while members of the jury were still in the courtroom, the Prosecutor approached the child and started talking with the child asking if he was all right, if he was doing okay. And I would object to this behavior because it highly prejudices the fairness in this trial. And at this time I would ask for a mistrial based on the Prosecutor's behavior in front of the jury.
>
> The Court: Your Motion for Mistrial is denied.
>
> Prosecutor: May I on the record, also, Your Honor, just briefly? I absolutely did tear up during the questioning. However, I took issue with the term "breakdown." I didn't start sobbing.
>
> The Court: Just to be fair, I've allowed Mr. McCoy to put his rendition of what occurred on the record. I think the record – just so the record is clear. I think we all agree that Ms. Epley did tear up. I think she did attempt to compose herself; it took a moment to do that. I think there were several jurors who were crying, and at your

request we took a break, Mr. McCoy; and they left the courtroom.

Defense counsel:  I understand, Your Honor.

Trial Record, Vol. 4, at 82-84 (Document No. 11-8 at 82-84).   Because the record reflects that the trial court took a break to allow the prosecutor to compose herself, and because nothing in the record shows that the prosecutor gained or attempted to gain any advantage over Hicks during the trial in relation to her emotional response to a child witness' testimony, the prosecutor cannot be said to have engaged in misconduct, nor does the record support a conclusion that the prosecutor's conduct affected Hicks' right to due process or the ultimate outcome of the trial.   Accordingly, the Texas courts' rejection of this prosecutorial misconduct/due process claim is not contrary to, or based on, an unreasonable application of clearly established federal law, nor is it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, Consequently, under § 2254(d), no relief is available on this claim.

## VI.    Discussion – Actual Innocence Claim (Claim 2)

In his next claim, Hicks alleges that he is actually innocent of the offense, and that one of the State's witnesses, D'Antye Johnson, has recanted his testimony in an affidavit he signed on December 17, 2016.   Respondent responds that an actual innocence claim cannot be asserted as an independent claim, and that even if it could, the state courts determined, as a matter of fact, that the affidavit of D'Antye "was obtained through deception and in bad faith by [Hicks'] sister," and, as such, does not support a claim of actual innocence.

The affidavit of D'Antye Johnson upon which Hicks' actual innocence claim is based was submitted to the state courts in connection with Hicks' state application for writ of habeas corpus.

The contents of that affidavit are as follows:

> My name is D'Yante Johnson. I am a minor age 10, and am competent to make this statement, and have personal knowledge of the facts stated here. On March 4, 2014 I was called by the State to testify against my dad Leonard Hicks. While on the stand, the District Attorney was making me uncomfortable and I felt pressured into answering questions that would make it sound like my dad was guilty. There was times I was crying because I felt bad for lying about my dad touching my sister Teannia Hicks. Ms. Epley started crying and I did feel bad for her and felt if I didn't answer her questions the way that pleased her we'd both get in trouble. Ms. Epley asked me if "Daddy Phillips" was in the courtroom and I said "yes", but I misunderstood the question and should have answered "no", he wasn't in the courtroom. I also said my dad had me punch my sister in her private, this wasn't the truth either, that's why that's why [sic] I was crying when I answered. I was confused and scared when I was questioned if I told the CPS people that my dad did touch my sister, he never touched her vagina. I've never referred to my dad as "Daddy Phillip" in my life. Now that I'm older and understand more I would have never testified for the State but rather in favor for my dad Leonard Hicks.

(Document No. 11-29) at 46. The state courts rejected Hicks' actual innocence claim upon the following findings of fact and conclusions of law:

### Alleged Actual Innocence

13.     In his third ground for relief, [Hicks] claims he is actually innocent. *Applicant's Writ at 10.* To support his claim of actual innocence, [Hicks] attached to his writ application the purported affidavit of D.J. [D'Antye Johnson]. *Applicant's Writ, Applicant's Exhibit A, Purported Affidavit of D.J., December 17, 2016.*

14.     The purported affidavit of D.J. claims that D.J. felt pressured by the State during trial, that he was crying during trial because he felt bad for lying that his dad had touched his sister, that he lied when he said that his dad had made him punch his sister in the vagina, and that "Daddy Phillip" is not the same person as his dad. *Applicant's Writ, Applicant's Exhibit A, Purported Affidavit of D.J., December 17, 2016.*

15.     On May 24, 2017, the trial court appointed Anna Emmons as the attorney ad litem to represent D.J., a juvenile, with respect to these writ allegations.

16.     On June 23, 2017, Emmons conducted an interview with D.J., which was electronically recorded and submitted to the trial court for review.

17.     In the recorded statement of D.J. dated June 23, 2017, D.J. states the

following: (1) that he is eleven years old; (2) that he agrees to tell the truth; (3) that "Exhibit A" is a piece of paper that his "Aunt DeeDee" took him to sign; (4) that he signed the piece of paper where his "Aunt DeeDee" told him to sign; (5) that in addition to signing the piece of paper, he also wrote his age, which was 10 at the time; (6) that "Aunt DeeDee" did not read it to him before he signed it; (7) that no one read it to him before he signed it; (8) that he did not read it before he signed it; (9) that Emmons read the paper to him; (10) that what is written in the paper is a lie; (11) that he remembers testifying in a court room; (12) that he testified to things that happened to him and his sister Teannia Hicks; (13) that when he testified in court about the things that happened to him and his sister it was the truth; (14) that no one told him how to testify or what to say; (15) that he remembers the person that did the things to him and his sister; (16) that the person who did the things to him and his sister was "L. Hicks"; (17) that "L. Hicks" was in the courtroom when he testified; (18) that he identified "L. Hicks" as the person that did the things to him and his sister; (19) that when he testified that "L. Hicks" did the things to him and his sister, that was the truth; and (20) that he has been truthful in this interview.

18.    The trial court finds that the statements made by D.J. in his recorded statement dated June 23, 2017 are credible and that the facts asserted therein are true.

19.    The trial court finds that the purported affidavit of D.J., dated December 17, 2016, was obtained through deception and in bad faith by [Hicks'] sister, Deanna Hicks.  The trial court further finds that D.J. had no knowledge abut the contents of the affidavit he was signing, and that he was merely directed to sign the affidavit by [Deanna] Hicks without [Deanna] Hicks or anyone else explaining to him what he was signing.  Accordingly, the trial court finds that the purported affidavit of D.J. dated December 17, 2016 carries no evidentiary value.

20.    The trial court finds that [Hicks] fails to allege any newly-discovered or newly-available evidence with which to evaluate his claim of actual innocence, and has failed to show that, by clear and convincing evidence, despite the evidence of guilt that supports the conviction, no reasonable juror could have found [Hicks] guilty in light of the alleged "new" evidence.

* * *

*Alleged Actual Innocence*

3.    [Hicks] has not presented an otherwise procedurally barred claim, therefore, [Hicks'] actual innocence claim is evaluated under the standard announced in *Herrera. See Herrera v. Collins*, 506 U.S. 390 (1993) *ex parte Elizondo*, 947 S.W.2d 202, 208 (Tex. Crim. App. 1996).

4.      [Hicks] has failed to demonstrate that the purported affidavit of D.J. is newly discovered or newly available evidence. *See ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006).

5.      Because [Hicks] has failed to provide any newly discovered or newly available evidence, he has failed to meet his burden of proof under an actual innocence claim. *See Herrera*, 506 U.S. at 399-400; *ex parte Harleston*, 431 S.W.3d 67, 89 (Tex. Crim. App. 2014).

6.      [Hicks] fails to prove, by a preponderance of the evidence, that there is newly discovered evidence of [his] innocence and that, by clear and convincing evidence, despite the evidence of guilty that supports the conviction, no reasonable juror could have found [him] guilty in light of the alleged new evidence. *Brown*, 205 S.W.3d at 545; *Elizondo*, 947 S.W.2d at 206.

Findings of Fact and Conclusions of Law (Document No. 11-30 at 47-49, 59).   That rejection of Hicks' actual innocence claim is not contrary to or based on an unreasonable application of clearly established law, nor is it based on an unreasonable determination of the facts in light of the evidence. The sealed videotaped interview of D'Antye Johnson by the ad litem that was appointed to represent him in the state habeas proceeding[1] *fully* supports the state trial court's findings that D'Antye Johnson's previously signed affidavit, in which he recanted his trial testimony, was procured by deception and that his testimony at trial was true.   Those factual findings by the state trial court render meritless Hicks' actual innocence claim, as concluded by the state courts in the state habeas proceeding.

Because the record supports the state courts' rejection of Hick's actual innocence claim, no relief is available to Hicks on that claim under § 2254(d).

---

[1] A CD of that interview was sent to the Court and has been filed under seal.

## VII.   Discussion – Trial Court Error Claims (Claim 4)

Hicks next claims that the state trial court erred in three respects: (1) failing to rule on his motion for new trial; (b) failing to address and rule on his motion for recusal in the state habeas proceeding; and (c) engaging in ex parte communications with the ad litem attorney appointed for the complainant's brother during the state habeas proceeding.

Hicks' trial court error claims related the state habeas proceeding warrant no relief as a matter of law.  "'[I]nfirmities in state habeas proceedings do not constitute grounds for relief in federal court.'" *Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001), *cert. denied*, 534 U.S. 1001 (2001); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) ("habeas corpus relief is not available to correct alleged errors in state habeas proceedings"); *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it 'is an attack on a proceeding collateral to the detention and not the detention itself.'").

As for Hicks' complaint that the state trial court erred in failing to rule on his motion for new trial, such a claim does not state, or implicate, a federal constitutional right.  In addition, even if such a claim could state a federal due process claim, Hicks has not shown that the motion, filed on March 13, 2014, within thirty days of his sentencing, on the basis that the verdict was contrary to the law and evidence (Document No. 11-13 at 141), had any merit.  Under Texas law, a timely filed motion for new trial is overruled by operation of law if it is not ruled on by the state trial court within seventy five days.  *See* TEX. R. APP. P. 21.8.  That is what happened here.  Because nothing prevented Hicks from raising the issue(s) contained in his Motion for New Trial in his direct appeal, and because Hicks did challenge the sufficiency of the evidence in his direct appeal, Hicks cannot

show that the state courts' rejection of that claim was contrary to or based on an unreasonable application of clearly established federal law.

## VIII.   Ineffective Assistance of Counsel Claims (Claim 3 and 5)

In his final claims, Hicks maintains that his trial and appellate counsel were ineffective in violation of his Sixth Amendment rights.  Trial counsel, according to Hicks, was ineffective for failing to interview witnesses prior to trial, failing to request a limiting instruction following the trial court's denial of counsel's motion for a mistrial, failing to call expert witnesses, and failing to emphasize before the jury that Hicks had been "ruled out" by CPS in January 2013.  As for appellate counsel, Hicks maintains that he was ineffective for failing to challenge the trial court's denial of his trial counsel's motion for a mistrial following the improper emotional behavior of the prosecutor. Respondent, in the Motion for Summary Judgment, argues that the state courts' rejection of these ineffectiveness claims is not contrary to or based on an unreasonable application of clearly established federal law and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The clearly established Federal Law applicable to claims of ineffective assistance of trial counsel is contained in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court determined that relief is available if a petitioner can show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had.  *Id*. at 687. Deficiency under *Strickland* is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable.  *Id*. at 687-689.  The prejudice element requires a petitioner to "show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A petitioner has the burden to prove both the deficiency and the prejudice prongs in order to be entitled to relief. *United States v. Chavez*, 193 F.3d 375, 378 (5th Cir. 1999).

Under *Strickland*, judicial scrutiny of counsel's performance is highly deferential and a strong presumption is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992) (citing *Strickland*), *cert. denied*, 509 U.S. 921 (1993). In order to overcome the presumption of competency, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland*, a petitioner must be able to establish that absent his counsel's deficient performance the result of his trial would have been different, "and that counsel's errors were so serious that they rendered the proceedings unfair or the result unreliable." *Chavez*, 193 F.3d at 378; *Cullen*, 131 S.Ct. at 1403 ("[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result") (quoting *Strickland*, 466 U.S. at 686)). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in the light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity

of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied*, 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland*, 466 U.S. at 690-691. Counsel will not be judged ineffective only by hindsight. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 124 S.Ct. 1, 6 (2003).

When an ineffective assistance of counsel claim has been adjudicated on the merits by the state courts, federal habeas review is "doubly deferential," with the court taking a "highly deferential look at counsel's performance" under *Strickland*, and then imposing a second layer of deference under § 2254(d). *Cullen*, 131 S.Ct. at 1403. Under § 2254(d), therefore, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 131 S.Ct. at 788. As for *Strickland's* prejudice prong, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 131 S.Ct. at 791. Instead, the question is whether "fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents. *Id.* at 786. If "'fairminded jurists could disagree' on the correctness of the state court's decision," § 2254(d)(1) precludes relief. *Id.* at 786. In contrast, where there is no "possibility that fairminded jurists could disagree" and fairminded jurists would uniformly conclude that the state court's decision is contrary to, or based on an unreasonable application of clearly established Federal law, relief is available under § 2254(d)(1). *Id.*

Claims of ineffective assistance of appellate counsel are generally assessed under the same

two part *Strickland* deficiency and prejudice standard as claims of ineffective assistance of trial counsel. *Williams v. Collins*, 16 F.3d 626, 635 (5th Cir.), *cert. denied*, 512 U.S. 1289 (1994). With respect to *Strickland's* deficiency prong, however, "[o]n appeal, effective assistance of counsel does not mean counsel who will raise every nonfrivolous ground of appeal available." *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998), *cert. denied*, 525 U.S. 1174 (1999); *see also Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir.) ("The Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal."), *cert. denied*, 493 U.S. 970 (1989). Rather, "[a]ppellate counsel is obligated to only raise and brief those issues that are believed to have the best chance of success." *Rose*, 141 F.Supp.2d at 704-705. "[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985) (cited with approval in *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). As for *Strickland's* prejudice prong, "[p]rejudice results if the attorney's deficient performance would likely render either the defendant's trial fundamentally unfair or the conviction and sentence unreliable." *United States v. Dovalina*, 262 F.3d 472, 474 (5th Cir. 2001).

### A.    Trial Counsel

Hicks faults trial counsel in four respects: for failing to interview witnesses prior to trial, failing to request a limiting instruction following the trial court's denial of counsel's motion for a mistrial, failing to call expert witnesses, and failing to emphasize before the jury that Hicks had been "ruled out" by CPS in January 2013. In the state habeas proceeding, Hicks' trial counsel, Kenneth McCoy, provided an affidavit addressing each of those claims of ineffectiveness, stating in relevant part that:

> 2) a)  D'Antye appeared as a witness for the state. D'Antye was a child witness. D'Antye Johnson testified that he saw the defendant touch the complaining witness

19

on her private parts. The defendant also made D'Antye hit the complaining witness. Counsel was not able to interview the child witness prior to trial because he did not wish to speak with the defense. Counsel was unable to locate or interview Kristian Johnson.

b) Counsel did not call any expert witnesses because none were needed. There was no physical evidence, DNA, or other forensic evidence that required rebuttal. The state's fingerprint experts testimony concerned well established scientific forensics. The state's child psychologist testified, over objection, to generalities.

c) Counsel was unaware that the defendant's IQ was only 69. Further, counsel does not believe this assertion by the defendant. Counsel met with and discussed the case with the defendant on numerous occasions. Counsel never saw any evidence the defendant had any mental defect.

3) Counsel did not request a limiting instruction because it was unnecessary.

4) Counsel did not request a limiting instruction because there was no basis for it. Counsel saw no misconduct by the prosecutor during the break. Counsel had no reason to object to the prosecutor's actions.

* * *

6) Counsel's strategy was to show the jury that the complaining witness was only three years old at the time of the alleged incident and that her memory of the event was incorrect. Counsel also planned to call Mr. Hicks to the stand during the guilt innocence portion of the trial to deny the allegations. However, at the last minute Mr. Hicks decided not to testify. Mr. Hicks also chose not to testify during the punishment phase of the trial.

a) Counsel is unclear how failing to emphasize that a CPS worker had "ruled out" Mr. Hicks as a suspect would have changed the verdict or rebutted the direct testimony of the witnesses.

(Document No. 11-30 at 35-36). The state trial court found the facts set forth in McCoy's affidavit to be true, and rejected each of Hicks' ineffective assistance of counsel claims (Document No. 11-30 at 44-59 and Document No. 11-31 1-3). In so doing, the state trial court concluded that McCoy did not interview D'Antye Johnson because he did not want to speak to the defense, and did not interview Kristian Johnson because she could not be located; that Hicks submitted no evidence that

counsel's failure to interview D'Antye Johnson or Kristian Johnson adversely affected their testimony, or their ability to provide any exculpatory evidence; that expert witnesses were not needed, and that Hicks failed to show that any expert witness could have testified favorably for the defense; that a limiting instruction was not warranted insofar as McCoy "minimized any impact the exchange between the prosecutor and D.J. had by immediately requesting a break during the proceedings" and the "exchange between D.J. and the prosecutor was never mentioned or emphasized by the prosecution or the defense at any point during trial;" and that McCoy did question witnesses and did argue in closing argument that Hicks had, at one point, been "ruled out" by CPS as a suspect. These findings, because there are supported by the contents of McCoy's affidavit, as well as the record of the trial proceedings, support the state trial court's conclusion that trial counsel was not ineffective. That determination is not contrary to, or based on an unreasonable application of, *Strickland*. Accordingly, under § 2254(d), no relief is available to Hicks on any of his ineffective assistance of trial counsel claims.

### B.    Appellate Counsel

As for Hicks' claim of ineffective assistance of appellate counsel, that is based on Hicks' assertion that appellate counsel should have raised issue with the trial court's denial of Hick's motion for a mistrial following the prosecutor's emotional conduct while questioning D'Antye Johnson. Appellate counsel, Michael Fosher, addressed this claim of ineffectiveness in the affidavit he filed in the state habeas proceeding:

> I did not consider the actions by the prosecutor to be reversible error in that the Appellate Court would not have found that the alleged error was grounds to grant a reversal of [Hicks'] conviction. At most, the Court would have found it to be harmless error. Secondly there was not an appropriate objection made by the defense counsel at trial since he only requested a mistrial instead of going through the proper procedures of having an objection sustained, then an instruction to the jury to

disregard and then a requested [ ] mistrial.  By not doing this counsel waived any error on this since the alleged error was not egregious enough for the Court to hold that Appellant was not required to go through the proper procedures to obtain an adverse ruling by the Court.  Thirdly, tearing up by the prosecutor did not seem to be of a sufficient nature that the [Appellate] Court would hold this as an error of prosecutorial misconduct that would grant a new trial.  Also the trial [c]ourt stated for the record that there were a couple of jurors crying during the complainant's testimony which in effect meant that they were moved by [the] nature of the testimony of the seven year old complainant.  I did not believe in all likelihood that an appellate court would hold that tearing up by the prosecutor was sufficient to constitute prosecutorial misconduct and if it was prosecutorial misconduct in any event the Appellate Court would have held it to be harmless error.  Also an appellate court would not find prosecutorial misconduct since the prosecutor was questioning a seven year old child and a certain amount of leeway would be given as compared to an ordinary adult witness. . . .

(Document No. 11-30 at 26).

The state trial court found the contents of Fosher's affidavit to be true and rejected Hicks' ineffective assistance of appellate counsel claim (Document No. 11-30 at 44-59; Document No. 11-31 at 1-3).  In so doing, the state courts did not dispute Fosher's assessment of the viability of raising such a claim on appeal.  Because that assessment by Fosher, accepted by the state courts, has not been shown to be objectively unreasonable, the state courts' rejection of Hicks' ineffective assistance of appellate counsel claim is not contrary to, or based on an unreasonable application of, *Strickland*.  Consequently, under § 2254(d) no relief is available on this claim.

## IX.   Conclusion and Recommendation

Based on the foregoing and the conclusion that no relief is available to Hicks on the merits of his claims under § 2254(d), the Magistrate Judge RECOMMENDS that Respondent's Motion for Summary Judgment (Document No. 10) be GRANTED, that Petitioner's Application for Writ of Habeas Corpus (Document No. 1) be DENIED and that this § 2254 proceeding be DISMISSED

WITH PREJUDICE on the merits.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140, 144-145 (1985); *Ware v. King*, 694 F.2d 89, 91 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this 16th day of August, 2019.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

23